J-S79017-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: B.A.C., A MINOR | : : : : : : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: S.J.E., MOTHER | : | No. 813 EDA 2016 |

Appeal from the Decree February 16, 2016
in the Court of Common Pleas of Philadelphia County
Family Court at No(s):  CP-51-AP-0000363-2015,
CP-51-DP-0001803-2013

| | | |
|---|---|---|
| IN THE INTEREST OF: A.D.C., A MINOR | : : : : : : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: S.J.E., MOTHER | : | No. 814 EDA 2016 |

Appeal from the Decree February 16, 2016
in the Court of Common Pleas of Philadelphia County
Family Court at No(s):  CP-51-AP-0000362-2015,
CP-51-DP-0001804-2013

BEFORE:  GANTMAN, P.J., MOULTON, and MUSMANNO, JJ.

MEMORANDUM BY MOULTON, J.:                **FILED DECEMBER 15, 2016**

S.J.E. ("Mother") appeals from the decrees entered February 16, 2016, in the Court of Common Pleas of Philadelphia County, which involuntarily terminated her parental rights to her minor son, B.A.C., born in May of 2010, and to her minor daughter, A.D.C., born in January of 2012

(collectively, "the Children").[1]  In addition, Mother appeals from the orders entered that same day, which changed the Children's placement goals to adoption.  We affirm.

We summarize the relevant factual and procedural history of this matter as follows.  On August 31, 2013, the Philadelphia Department of Human Services ("DHS") obtained orders of protective custody for the Children, based on allegations that Mother, Father, and the Children were squatting in a home without food or running water.  On September 3, 2013, the trial court entered shelter care orders directing that the Children would remain in DHS custody.  The court adjudicated the Children dependent on September 10, 2013.[2]

On June 5, 2015, DHS filed petitions to involuntarily terminate Mother's parental rights to the Children, as well as petitions to change the placement goals of the Children to adoption.  The trial court held a termination and goal change hearing on February 16, 2016, during which the court heard the testimony of DHS social worker Britton Stewart and

_____

[1] The trial court entered separate decrees terminating the parental rights of R.H.C., Jr. ("Father").  Father has not filed a brief in connection with the instant appeal, nor has he filed his own separate appeal.

[2] The trial court found aggravated circumstances as to Mother on December 10, 2013, based on the earlier termination of Mother's parental rights to a different child.  Despite this finding, the court ordered that DHS should continue to make efforts to reunite Mother and the Children.

Children's Choice caseworker Juliane Keegan. Following the hearing, the court entered decrees terminating Mother's parental rights, as well as orders changing the placement goals of the Children to adoption. Mother timely filed notices of appeal on March 17, 2016, along with concise statements of errors complained of on appeal.

Mother now raises the following issues for our review.

1. Did [DHS] sustain the burden that Mother's rights should be terminated when there was evidence that Mother had completed and/or had been actively completing her permanency goals?

2. Was there [] sufficient evidence presented to establish that it was in the best interest of the child to terminate Mother's parental rights?

Mother's Br. at 4 (trial court answers omitted).[3]

We consider Mother's claims mindful of our well-settled standard of review.

_____

[3] While Mother purports to appeal from the trial court's goal change orders, she does not raise any claim regarding these orders in her statement of questions involved. Moreover, Mother does not develop any argument in her brief that the court erred or abused its discretion by changing the Children's placement goals. Accordingly, Mother has failed to preserve any challenge to the goal change orders for our review. **See Krebs v. United Refining Co. of Pa.**, 893 A.2d 776, 797 (Pa.Super. 2006) ("We will not ordinarily consider any issue if it has not been set forth in or suggested by an appellate brief's statement of questions involved, . . . .") (citations omitted); **In re W.H.**, 25 A.3d 330, 339 n.3 (Pa.Super. 2011), *appeal denied*, 24 A.3d 364 (Pa. 2011) (quoting **In re A.C.**, 991 A.2d 884, 897 (Pa.Super. 2010)) ("'[W]here an appellate brief fails to provide any discussion of a claim with citation to relevant authority or fails to develop the issue in any other meaningful fashion capable of review, that claim is waived.'").

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Termination of parental rights is governed by section 2511 of the Adoption Act, 23 Pa.C.S. §§ 2101-2938, which requires a bifurcated analysis.

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007) (citations omitted).

In this case, the trial court terminated Mother's parental rights pursuant to sections 2511(a)(1), (2), (5), (8), and (b). We need only agree

with the court as to any one subsection of section 2511(a), as well as section 2511(b), in order to affirm. *In re B.L.W.*, 843 A.2d 380, 384 (Pa.Super. 2004) (*en banc*). Here, we analyze the trial court's decision to terminate under sections 2511(a)(8) and (b), which provide as follows.

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> ***
>
> (8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.
>
> ***
>
> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(8), (b).

We first address whether the trial court abused its discretion by terminating Mother's parental rights pursuant to section 2511(a)(8).

> In order to terminate parental rights pursuant to 23 Pa.C.S.[] § 2511(a)(8), the following factors must be demonstrated: (1) The

child has been removed from parental care for 12 months or more from the date of removal; (2) the conditions which led to the removal or placement of the child continue to exist; and (3) termination of parental rights would best serve the needs and welfare of the child.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1275-76 (Pa.Super. 2003). "Notably, termination under Section 2511(a)(8)[] does *not* require an evaluation of [a parent's] willingness or ability to remedy the conditions that led to placement of her children." *In re Adoption of R.J.S.*, 901 A.2d 502, 511 (Pa.Super. 2006) (citations omitted) (emphasis in original).

In this case, the trial court found that the Children had been removed from Mother's care for more than twelve months, and that Mother had failed to remedy the issues that caused the Children to be removed from her care. Trial Court Opinion, 5/23/2016, at 13-14. The court explained that it credited the testimony presented by DHS during the termination and goal change hearing that Mother had failed to complete her reunification objectives, and that she was unable to fulfill her parental responsibilities. *Id.* at 13. Additionally, the court found that terminating Mother's parental rights would best serve the Children's needs and welfare. *Id.* at 14. The court reasoned that the Children had no bond with Mother, and instead were bonded with their foster parents. *Id.* at 14-15.

Mother argues that DHS failed to present clear and convincing evidence that her parental rights should be terminated. Mother's Br. at 8-14. Mother contends that she is close to completing all of her reunification objectives. *Id.* at 12-14. Mother further asserts that DHS failed to establish

that terminating her parental rights would best serve the Children's needs and welfare. *Id.* at 14-16. Mother insists that the evidence presented during the termination and goal change hearing was insufficient to establish that the Children are not bonded to her. *Id.* at 16. Mother emphasizes that Mr. Stewart, the DHS social worker, did not testify about the relationship between Mother and the Children, and that the court did not have the benefit of a bonding evaluation. *Id.*

The trial court did not abuse its discretion by involuntarily terminating Mother's parental rights to the Children. During the termination and goal change hearing, Mr. Stewart testified that the Children were removed from Mother's care due primarily to the conditions in her home. N.T., 2/16/2016, at 12. Mr. Stewart explained that the home was filthy, the Children appeared dirty, and Mother refused to go to a shelter. *Id.* at 12-13. DHS prepared reunification objectives for Mother to address this issue, which included completing a parenting program, obtaining mental health treatment, obtaining suitable housing, and participating in visitation with the Children. *Id.* at 6-7.

With respect to Mother's parenting program objective, Mr. Stewart testified that he referred Mother to the Achieving Reunification Center for parenting instruction on multiple occasions, but that Mother was discharged due to noncompliance. *Id.* at 7. Mother ultimately provided Mr. Stewart with a document indicating that she had completed a parenting program, but this was not until after or shortly before DHS filed its petitions to terminate

her parental rights in June of 2015. *Id.* at 29. Concerning Mother's mental health objective, Mr. Stewart testified that Mother has participated in therapy since at least March of 2015. *Id.* at 26. However, according to Mother's therapist, she had only participated in therapy consistently since June of 2015. *Id.* at 30. Mr. Stewart believed that, at the time of the hearing, Mother was compliant with therapy. *Id.* at 28.

With respect to Mother's housing objective, Mr. Stewart testified that Mother still did not possess adequate housing. *Id.* at 10. Mr. Stewart explained that he offered to provide financial assistance to Mother if she was able to locate housing for herself and the Children. *Id.* at 33. This assistance included paying Mother's first month's rent, last month's rent, and security deposit. *Id.* at 33-34. Unfortunately, none of the residences that Mother located were appropriate. *Id.* at 34. Mr. Stewart recalled that he visited three separate residences of Mother during his time on this case. *Id.* at 15. The first two residences were abandoned homes. *Id.* at 16-17. The third residence, where Mother resided most recently, was a boarding house. *Id.* at 17. Mr. Stewart stated that the boarding house would be an inappropriate place for the Children, because "it's just one room and . . . they would share the bathroom with other tenants. So you would literally have to do clearance[s] on the tenants of the home, all those other apartments." *Id.* at 18. Mr. Stewart acknowledged that Mother completed a housing program at the Achieving Reunification Center, but she did not do

so until after the filing of the termination petitions in June of 2015. *Id.* at 33.

With respect to Mother's visitation objective, Children's Choice caseworker Juliane Keegan testified that she had supervised about seventy-five percent of Mother's visits since being assigned to this case in September of 2014. *Id.* at 39, 52. Ms. Keegan explained that Mother initially attended her visits with the Children on a consistent basis, but that Mother's attendance at visits had become more sporadic. *Id.* at 39. Concerning the relationship between Mother and the Children, Ms. Keegan stated, "The kids enjoy seeing mom. She brings them snacks and cookies every time. However, during times when [M]other has missed visits, I have not really seen a negative effect in either child." *Id.* at 40. For example, one of Mother's recent visits had to be cancelled due to Mother arriving forty-five minutes late. *Id.* Ms. Keegan visited with the Children at their foster home later that day. *Id.* at 41. Ms. Keegan recalled, "I saw both children and they were happy. They were playing when I arrived. They didn't seem to be upset or negatively affected that the visit was cancelled." *Id.* Ms. Keegan added that the Children used to ask about Mother when visits were cancelled, but that lately "they haven't asked at all." *Id.* at 50. Ms. Keegan did not believe that either of the Children had an appropriate parent/child bond with Mother, as the Children did not look to Mother for support and redirection. *Id.* at 50-51. In contrast, Ms. Keegan opined that the Children had a close, parental relationship with their pre-adoptive foster parents. *Id.*

at 42-43. The Children referred to the foster parents as "mom and dad," and looked to them for parental support and love. *Id.* at 42, 51-52.

The record supports the trial court's findings. The Children had been removed from Mother's care for twelve months or more. As discussed above, the Children were removed from Mother's care on August 31, 2013, so that at the time of the termination and goal change hearing, on February 16, 2016, the Children had been removed from Mother's care for nearly two and half years.

Further, the record supports the trial court's conclusion that the conditions that led to removal continued to exist. Mother failed to make significant progress toward completing her reunification objectives until either after or immediately before DHS filed its petitions to terminate her parental rights on June 5, 2015. Pursuant to section 2511(b), the trial court could not consider any efforts initiated by Mother after she received notice of the filing of the petitions. *See* 23 Pa.C.S. § 2511(b) ("With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition."). Even assuming that Mother initiated efforts to complete her reunification objectives prior to receiving notice, she did not remedy the conditions that caused the Children to be removed from her care, as Mother continued to lack appropriate housing.

Finally, the trial's court conclusion that terminating her parental rights would best serve the needs and welfare of the Children was supported by sufficient evidence. The testimony presented by Ms. Keegan supports the court's finding that the Children were not bonded with Mother but were bonded with their pre-adoptive foster parents. While Mother emphasizes that the court did not have the benefit of a formal bonding evaluation when assessing the relationship between Mother and the Children, it is well-settled that a court in a termination proceeding "is not required by statute or precedent to order a formal bonding evaluation be performed by an expert." *In re K.K.R.-S.*, 958 A.2d 529, 533 (Pa.Super. 2008).

We next consider whether the trial court abused its discretion by terminating Mother's parental rights pursuant to section 2511(b). We have discussed our analysis pursuant to section 2511(b) as follows.

> Section 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. As this Court has explained, Section 2511(b) does not explicitly require a bonding analysis and the term 'bond' is not defined in the Adoption Act. Case law, however, provides that analysis of the emotional bond, if any, between parent and child is a factor to be considered as part of our analysis. While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.
>
> > [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court

stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re Adoption of C.D.R.*, 111 A.3d 1212, 1219 (Pa.Super. 2015) (quoting *In re N.A.M.*, 33 A.3d 95, 103 (Pa.Super. 2011)) (quotation marks and citations omitted).[4]

As explained above, the trial court did not abuse its discretion in finding that terminating Mother's parental rights will best serve the developmental, physical, and emotional needs and welfare of the Children. The record supports the trial court's conclusion that the Children did not share a bond with Mother, and instead were bonded with their pre-adoptive foster parents and that Mother remained unable to care for the Children.[5]

---

[4] We observe that sections 2511(a)(8) and (b) both require a court considering a termination petition to assess the needs and welfare of the relevant child or children. However, the needs and welfare analysis required by section 2511(a)(8) is distinct from the needs and welfare analysis required by section 2511(b), and must be addressed separately. *See In re C.L.G.*, 956 A.2d 999, 1009 (Pa.Super. 2008) (*en banc*) ("[W]hile both Section 2511(a)(8) and Section 2511(b) direct us to evaluate the 'needs and welfare of the child,' . . . they are distinct in that we must address Section 2511(a) before reaching Section 2511(b).").

[5] As this Court has stated, "a child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." *In re Adoption of R.J.S.*, 901 A.2d at 513.

Based on the foregoing, we conclude that the trial court did not abuse its discretion by involuntarily terminating Mother's parental rights to the Children.

Decrees affirmed. Orders affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary


Date: 12/15/2016